# SUMMONS - CIVIL
**JD-CV-1 Rev. 9-08**
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a,
52-48, 52-259, P.B. Secs. 3-1 through 3-21, 8-1

### STATE OF CONNECTICUT
## SUPERIOR COURT
*www.jud.ct.gov*

**See other side for instructions**

TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

- [ ] "X" if amount, legal interest or property in demand, not including interest and costs is less than $2,500.
- [X] "X" if amount, legal interest or property in demand, not including interest and costs is $2,500 or more.
- [X] "X" if claiming other relief in addition to or in lieu of money or damages.

*1-3-09*
*1-3-09 Zyko*

*7007 26A0 0001 3276 7495*

| Address of court clerk where writ and other papers shall be filed *(Number, street, town and zip code)* *(C.G.S. §§ 51-346, 51-350)* | Telephone number of clerk *(with area code)* | Return Date *(Must be a Tuesday)* | | |
|---|---|---|---|---|
| 300 Grand St., Waterbury, CT   06702 | (203) 591-3300 | **February** | **24**, | **2009** |
| | | *Month* | *Day* | *Year* |

| [X] Judicial District | [ ] G.A. | At *(Town in which writ is returnable)* *(C.G.S. §§ 51-346, 51-349)* | Case type code *(See list on page 2)* | |
|---|---|---|---|---|
| [ ] Housing Session | Number: | Waterbury | Major: **C** | Minor: **20** |

## For the Plaintiff(s) please enter the appearance of:

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(to be entered by attorney only)* |
|---|---|
| Eddi Z. Zyko, Esquire, 120 Fenn Rd., Middlebury, CT 06762- | 071655 |

| Telephone number *(with area code)* | Signature of Plaintiff *(if self-represented)* |
|---|---|
| (203) 758-8119 | |

| Number of Plaintiffs: 2 | Number of Defendants: 3 | [ ] Form JD-CV-2 attached for additional parties |
|---|---|---|

| Parties | Name (Last, First, Middle Initial) and Address of Each party (Number; Street; P.O. Box; Town; State; Zip; and Country, if not USA) | |
|---|---|---|
| First Plaintiff | Name: Loubier, Gervais V. <br> Address: 341 Lincoln St., Waterbury, CT 06710 | P-01 |
| Additional Plaintiff | Name: The Estate of Claudette J. Loubier <br> Address: 341 Lincoln St., Waterbury, CT 06710 | P-02 |
| First Defendant | Name: Allstate Insurance Company, c/o CT Insurance Commissioner, <br> Address: Thomas R. Sullivan, 153 Market St., Hartford, CT 06103 | D-50 |
| Additional Defendant | Name: Clifford, Sean, Allstate Insurance Agent <br> Address: 1015 Meriden Rd., Waterbury, CT 06705 | D-51 |
| Additional Defendant | Name: McKinsey & Company <br> Address: Three Landmark Square, Suite 100, STamford, CT 06901 and | D-52 |
| Additional Defendant | Name: via U.S. Mail to <br> Address: 55 East 52nd St., 23rd Floor, New York, NY 10022 | D-53 |

## Notice to Each Defendant

1. **YOU ARE BEING SUED.** This paper is a Summons in a lawsuit. The complaint attached to these papers states the claims that each plaintiff is making against you in this lawsuit.
2. To be notified of further proceedings, you or your attorney must file a form called an "Appearance" with the clerk of the above-named Court at the above Court address on or before the second day after the above Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to come to court.
3. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default. The "Appearance" form may be obtained at the Court address above or at www.jud.ct.gov under "Court Forms."
4. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately contact your insurance representative. Other action you may have to take is described in the Connecticut Practice Book which may be found in a superior court law library or on-line at www.jud.ct.gov under "Court Rules."
5. If you have questions about the Summons and Complaint, you should talk to an attorney quickly. The Clerk of Court is not allowed to give advice on legal questions.

| Signed (Sign and "X" proper box) | [X] Commissioner of the Superior Court <br> [ ] Assistant Clerk | Name of Person Signing at Left | Date |
|---|---|---|---|
| *Eddi Z. Zyko* | | Eddi Z. Zyko, Esquire | 1-9-09 |

| If this Summons is signed by a Clerk: | For Court Use Only |
|---|---|
| a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts. <br> b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law. <br> c. The Clerk is not permitted to give any legal advice in connection with any lawsuit. <br> d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service of the Summons or Complaint. | File Date <br><br> A TRUE COPY ATTEST <br> Gerald Ratino, State Marshal |

| I certify I have read and understand the above: | Signed (Self-Represented Plaintiff) | Date signed |
|---|---|---|
| Name and address of person recognized to prosecute in the amount of $250 | | |

| Signed (Official taking recognizance; "X" proper box) | [ ] Commissioner of the Superior Court <br> [ ] Assistant Clerk | Date | Docket Number |
|---|---|---|---|

F. 4   NO. 549   SNI ALLSTAIE INS   JAN. 22. 2009  3:17PM

RETURN DATE:  FEBRUARY 24, 2009     :     SUPERIOR COURT

GERVAIS V. LOUBIER AND           :     JUDICIAL DISTRICT
THE ESTATE OF CLAUDETTE J. LOUBIER
     PLAINTIFFS,            :     OF WATERBURY

VS.                           :

                           :     AT WATERBURY

ALLSTATE INSURANCE COMPANY, SEAN    :
CLIFFORD AND MCKINSEY & COMPANY, INC., :
DEFENDANTS.             :     JANUARY 9, 2008

## COMPLAINT

### COUNT I:  BREACH OF CONTRACT BY ALLSTATE INSURANCE COMPANY

### I. PARTIES

1. At all times mentioned herein, the defendant, Allstate Insurance Company (Allstate):

    a.  Was and is a corporation duly licensed to transact insurance business in the State of Connecticut.

    b.  Sold its products with the slogan "You (its policy holders) are in Good Hands™ with Allstate."

    c.  Sold its products through its own licensed insurance agents, who were/are its employees.

    d.  Operated its casualty claims system under its "Claims Core Process Redesign" (CCPR), which it implemented in 1995 and is discussed below.

2. At all times mentioned herein, the defendant, Sean Clifford (Clifford), was and is:

    a.  Duly licensed to transact insurance agency business in the Connecticut.

    b.  An employee of Allstate.

    c.  The only insurance agent of Claudette J. Loubier and Gervais V. Loubier.

3. At all times mentioned herein, defendant, McKinsey & Company, Inc., (Mckinsey):

    a. Was and is a corporation duly licensed to transact management consulting business in the State of Connecticut.

    b. Researched, designed, "sold" to Allstate said CCPR in conjunction with Allstate's senior management and, subsequently, supported the operation thereof.

4. At all times mentioned herein, Claudette J. Loubier and Gervais V. Loubier, husband and wife for some 45 years, had a contract for automobile insurance (Policy Number 0 25 455436 03/05 ) with Allstate that they had obtained through Clifford, who they were led to believe by him and Allstate was their insurance agent. Upon Mrs. Loubier's death from cancer on October 31, 2007, the Court of Probate, District of Waterbury, Connecticut, District 151, appointed her husband Executor of her Estate for which fiduciary position he was duly qualified and is now acting as such.

## II. STATE OF CONNECTICUT LAW FOR THE BENEFIT OF AUTOMOBILE INSURANCE POLICYHOLDERS

5. The Connecticut Auto Insurance Reform Act, which took effect January 1, 1994, repealed mandatory no-fault coverage and changed the way uninsured-underinsured motorist coverage works with the following options that were required to be made available to all all Connecticut motorists by their insurer:

    a. Standard uninsured-underinsured motorist coverage automatically equals one's liability coverage, but now a driver can buy uninsured-underinsured motorist coverage that is double his or her liability coverage. Or, one can reduce uninsured-underinsured motorist coverage to less than one's liability coverage. Premiums go up for double coverage, down for reduced.

    b. Drivers can also buy conversion coverage, which entitles them to the full amount of uninsured-underinsured coverage they carry, without anything else — like

2

payments from the other driver's insurer — being subtracted from any settlement. But, the foregoing was not good financially for Allstate. Therefore, Allstate intentionally, did not properly implemented it in Allstate's sales and claims handling.

### III.  BACKGROUND ALLEGATIONS REGARDING ALLSTATE AND THE REDESIGN OF ITS CLAIM HANDLING PROCESSES

6.   Allstate's "mission" has been stated as follows: "To Be The Best . . . serving our customers by providing peace of mind and enriching their quality of life through our partnership  in the management of the risks they face"

7.   Allstate contends that its slogan, "You're in Good Hands With Allstate" promises peace of  mind and reliability.

8.   In June of 1993 Allstate had the largest Initial Public Offering (IPO) of stock in the history of the United States.

9.   In 1993, Allstate posted record earnings, as evidenced by its financial statements.

10.   Following 1993, among its key strategic goals Allstate included "improving our competitive price position in the marketplace" and "posting a financial return that will rank with  the highest in our industry peer group."

11.  Allstate expected to accomplish its goals in part by utilizing "loss and expense containment initiatives."

12.  Allstate in conjunction with McKinsey analyzed its claim practices and  redesign-ed them in order to generate a profit from the activities of the claim department.

13.  Allstate intended to "(use) technology"; "leverage the skills and abilities of (its)

3

employees  through education and training"; and "manage both legal costs and
quality of settlement" to reduce  its expense ratio.

14.   Allstate experienced favorable net reserve development in 1992, 1993, 1994 and
1995 "as  a result of favorable severity trends".

15.   The favorable severity development in 1994 and 1995 personal injury claims was
believed  by Allstate to be partly attributable to "improvements in the Company's claim
settlement process".

16.   These "improvements" are described as Company initiatives to "assess and
manage the  reasonableness of medical claims" and "increase the use of special
investigative units to reduce  fraud".

17.   Upon information and belief, there have been no, or insignificant, claims
handling practice changes in Connecticut as a result of bad faith lawsuit claims,
settlements, judgments or verdicts against Allstate.    Indeed,  there are/were many
"bad faith" claims pending in the State of Connecticut courts,  beginning in or about
1995  and continuing through the present as evidenced by the documents attached at
Exhibit A,  which are incorporated here.    Also, upon information and belief, there have
been many settlements driven by said "improvements", which are further described
below and plaintiffs will need the aid of discovery to unearth them.

18.   Allstate is aware, and trains its claims personnel that they have a duty to
investigate, which  means to "objectively pursue leads and facts which are
reasonable under the circumstances".

19.   Allstate is aware, and trains its claims personnel that they have a duty to perform an "objective evaluation of facts" relating to a claim, "not shading the information to one side or the other".

20.   Nonetheless, Allstate trains its claims personnel that a claim file must have three basic elements while it progresses through the claims channels: FOCUS – there must be a series of "objectives" MOMENTUM – energy to reach the desired "objectives" ANALYSIS – evaluate your "focus"; evaluate your "energy level"; evaluate the information in the file and "set your objectives".

21.   Allstate's primary "objective" in implementing a redesign of its claims process was to "reduce claims severity".

22.   In essence, Allstate trains its claims personnel to evaluate claims keeping in mind the company-wide objective of paying less to claimants.

23.   Allstate performed "Performance Reviews" of its claims personnel where personnel were evaluated according to how they "managed" losses by "controlling severities".

24.   Allstate tracked "average severities" for each claims unit and each adjuster in the unit and commended those claims adjusters whose average paid claims were the lowest during performance reviews.

25.   Allstate encouraged competition amongst its own claims personnel to determine who could reduce claim severity the most in the following coverages:

5

bodily injury, property damage, medical payments, collision, comprehensive, and uninsured motorist.

26.   The competition categories were to be tracked monthly and points awarded in each category with winners declared quarterly. The winners were awarded "a handsome trophy emblematic of their accomplishments" and a cash award "to be used as determined by your own DCO awards committee".

27.   Allstate sets "target goals" for its claims personnel to facilitate its goal of reducing claims severity. Allstate has a "Personnel File Purge Schedule" in its HRS processing manual which dictates that "personnel records should be purged on a scheduled basis" using specific guidelines.

28.   Allstate advises its adjusters that achieving the "target goals" for claims severity is one of the adjuster's individual goals for consideration for promotion.

29.   Allstate staged monthly contests among local claim adjusters to meet goals in several different categories of claim performance that all contributed to lower claim severity, and paid bonuses to adjusters for meeting those goals by awarding them the right to charge personal expenses on their company credit card.

30.   Allstate paid the locally administered bonuses from a local fund administered outside of the normal Human Resources process for paying salaries and bonuses, claiming that the payments are not part of Allstate's "compensation structure", but rather part of an "employee welfare program".

31.   Allstate typically paid these bonuses in increments of $20, did not report them as employee compensation to state or federal taxing authorities, and categorized the payments as "employee recognition" instead of "bonuses" in order to conceal the practice from litigants such as Plaintiffs.

### Claim Core Process Redesign

32.   Allstate has a central "Allstate Library" located in the Home Office which include an online catalog of training and systems manuals and forms, several CD-ROM databases, access to external databases, and a collection of business and insurance related books, magazines, audio cassettes, and videotapes.

33.   In 1995 Allstate implemented a Claim Core Process Redesign, and issued an Implementation Training Manual (the "CCPR Manual") which set out in summary Allstate's nationwide strategy to redesign its claims practices to enable it to "reduce claim severity". The strategies set forth in the CCPR Manual were developed by McKinsey on Allstate's behalf.

34.   "Reduce Claim Severity" is an insurance industry euphemism for paying less on claims.

35.   There is no logical basis to believe that claimants are being "less injured" in collisions and health care costs are not decreasing historically.

36.   Allstate's own analysis shows that the Medical Consumer Price Index has escalated by approximately 35% over the same ten year period during which Allstate's bodily injury severity was reduced by approximately 10-25%.

7

37. However, Allstate understands, as stated in the CCPR Manual, that it has to pay 2-3 times more on minor impact soft tissue claims when an attorney is involved.

38. One of the strategies to help achieve the goal of paying less on claims, as stated in the CCPR Manual, is to endeavor to: (A) reduce attorney representation rates; and (B) use a computer program called Colossus to drive down the "value" of claims.

### (A) Reducing Attorney Representation Rates

39. This strategy to "keep the lawyers out" incorporates a two-pronged approach, as stated in the CCPR Manual:

   (1) Try to control the claimant/adjuster interaction in such a way as to prevent "losing the claim" to an attorney; and if that fails and the claimant retains counsel,

   (2) "discourage disposition by trial based on likely costs".

40. Allstate Market Claim Managers made the commitment to Allstate agents that "claim representatives will be more understanding, caring, empathetic, and will do-whatever-it-takes to remove any need for an attorney. This will include settlement offers in a range that will make their claim economically unacceptable to an attorney".

41. Allstate advises its agents that they "must not volunteer, advise, suggest, or in answer to a customer's request or any other person involved in a claim or loss, recommend a particular attorney".

42. Allstate's claim personnel are similarly prohibited from recommending attorneys. Prevention of "Loss of Claim" to Attorney

43.   To facilitate its goal of reducing attorney representation rates, Allstate developed a nonstop process for initiating contact with claimants.

44.   The eighth step entailed a deceptive discussion of "attorney economics" wherein Allstate informed insureds that attorneys often charge one-third of the gross recovery as fees, but failed to inform those insureds that Allstate's own experience was that represented claimants typically recovered 2-3 times the amount paid to unrepresented claimants for similar claims.

45.   Allstate represents that "it's in times of trouble when our customers need us most. And it's our Claims Representatives who are often the connection between our customers and peace of mind. They are the kind of people who rise up to challenges and get satisfaction out of helping others".

46.   Allstate understands that consumers need enough information to make "thoroughly informed, rational choices" on such issues as air bag deactivation, yet Allstate does not disclose the information about represented claimants recovering higher amounts.

47.   Allstate represents to policyholders that "when you bought your policy you were really buying claim service. And Allstate gives the best."

48.   Allstate represents to policyholders that it provides "fast, unmatched claim service" and that it uses "advanced computer systems to speed information on your policy to where it's needed".

9

49.   Allstate neglects to inform its policyholders that the implementation of loss control initiatives has related to an increase in the time it takes to settle claims and a corresponding increase in the number of outstanding claims.

50.   Allstate neglects to inform claimants that it has decided to "increase investigation of minor strains and sprains that result from low- or moderate-impact collisions and aggressively defend lawsuits".

51.   Allstate claims personnel are trained to make face-to-face contact with claimants and "establish empathy" to further discourage claimants from hiring attorneys.

<u>Discouraging Disposition by Trial</u>

52.   Allstate has trained its claims personnel to understand and utilize to its advantage the following concepts:

   a.  Plaintiff's attorneys operate under financial pressures to pay ongoing recurrent obligations to keep their offices open;

   b.  Plaintiff's attorneys will usually be required to absorb the loss of unrecouped costs of litigation;

   c.  The amount of attorney time expended does not ordinarily have an impact on the ultimate value of the claim;

   d.  The value of a claim does not ordinarily increase over time.

   e.  "Litigation can be a very expensive process".  Role of the Plaintiff Attorney, p. 15

   f.  "The stakes get higher when litigation enters the discovery phase".

Role of the Plaintiff Attorney, p. 16

g. "The most expensive phase of litigation by far is the trial".   Role of the Plaintiff Attorney, p. 18

h. "Next to the time attorneys spend on trying the case itself, expert witness fees can be the most expensive part of a trial".   Role of the Plaintiff Attorney, p. 18

i. "Another strategic time to negotiate can be before trial preparation commences.   Now with this kind of time and money at stake, the attorney would much rather settle most cases out of court, often despite his threats to the contrary".   Role of the Plaintiff Attorney, p. 19

j. "As a claim representative it's important to understand the financial impact a trial can have on the Plaintiff attorney.  This can be very powerful information to have when negotiating".   Role of the Plaintiff Attorney, p. 20

k. "Since going to trial is the most expensive, time consuming, and risky way to resolve a case, the attorney is under a great deal of pressure to settle out of Court and do it quickly".   Role of the Plaintiff Attorney, p. 22

l. "Due to the time value of money, additional pressure is placed on the attorney to settle quickly.  The longer a case is open, the more time and money the firm stands to lose.  And with a heavy caseload, an attorney doesn't have time to keep many open cases on the books".   Role of Plaintiff Attorney, p. 22

m. "The biggest pressure of all can come from impatient clients who demand to have their money now".   Role of Plaintiff Attorney, p. 23

n. "Take an aggressive stand and let the power of information put you in control".   Role of Plaintiff Attorney, p. 33

o. "Once the word gets out that Allstate is not going to be pressured into settling, the attorney may be inclined to accept our offer".   Role of Plaintiff Attorney, p. 15

11

53.   With respect to alternative dispute resolution (ADR), such as court-annexed arbitration or mediation, Allstate's CCPR Manual states that pressure to use ADR is a factor that drives inflation of minor impact soft tissue settlements, and that the "solution" is "litigation of all winnable claims".

54.   Allstate had the fourth largest legal department of any company in the United States as of 1998.

55.   Allstate's CEO Jerry Choate has stated "we are not going to be pushed into early settlement on [minor impact soft tissue] cases because the lawyers would like to settle".

56.   In summary, not only does Allstate want to discourage claimants from seeking legal representation, it wants to discourage attorneys from representing claimants by making it prohibitively expensive to do so.

## Colossus

57.   Colossus is a software program purportedly designed to "think" for its users with the purported intention of "improving claims handling".

58.   Colossus was developed in the late 1980's in Australia by a company named Continuum.  Continuum and its Colossus software program were both purchased in 1991 by Computer Sciences Corporation (CSC) of Austin, Texas.

59.   CSC rebuilt Colossus and sold and continues to sell licenses for its use to insurance companies including, but not limited to, Allstate.

60.   Colossus is used by insurance claims adjusters, providing them with access to more than 10,000 "rules" for evaluating more than 600 traumatically induced injuries.

61.   Through a series of "interactive questions" Colossus purportedly guides adjusters in evaluating the level of pain and suffering, the effect the injury has had in terms of permanent impairment to the body, and the impact on the Claimant's lifestyle.

62.   At the conclusion of a Colossus "consultation" a summary of the claim is provided, including a recommended settlement range.

63.   In reality, Colossus was designed to treat individual claims generically, and uniformly and arbitrarily reduce over claim severity from historical averages by an arbitrary percentage goal predetermined by Allstate.

64.   The percentage reduction was accomplished by activities undertaken at the local, regional, and home office level in the Colossus "tuning" process, and the claim savings were measured and monitored by claims management on a regular basis.

65.   Despite contentions that Colossus is merely a "tool" that makes a recommendation, in the aggregate, the amounts paid by Allstate for bodily injury claims rigidly adhere to the amounts determined by Colossus in order to generate and capture the savings Colossus was designed, marketed, and implemented to achieve.

66.   In summary, Allstate requires its adjusters to use the Colossus computer

13

software program to determine base.claim values based on a pre-determined
reduction from historical averages for similar claims.

67. This requirement substantially impairs the adjuster's ability to fairly and promptly
evaluate and settle claims based on the merits of an individual claim.

68. Allstate knows that under accepted insurance industry standards and practices
insurers cannot and should not operate in secrecy and cannot create "secret" claims
handling standards, procedures, protocols and systems.

69. Allstate knows that under accepted insurance industry standards and practices
Allstate must not only disclose its methods in the normal course of business, but
must also adopt and implement reasonable available standards, procedures,
protocols and systems to ensure the prompt, fair, honest and complete investigation,
evaluation and settlement of claims which must also be made available for
inspection and examination when disputes arise or claims are made that Allstate
has adopted or engaged in unfair, deceptive or fraudulent claims handling standards,
or practices or procedures or systems.

70. Allstate knowingly and intentionally uses Colossus, and other corporate
protocols described specifically or in general herein, as a national litigation strategy
to create controversy where none actually exists in order to force Allstate insureds
with legitimate claims into litigation in hopes that these insureds will abandon their
legitimate claims or accept substantially less than the actual and reasonable value of
these claims as projected by Allstate in its premium rate filings despite the fact that
Allstate has been sanctioned by courts for its use of these litigation protocols and

tactics on routine cases where no real controversy exists.

71.  All of these practices and procedures described in this Complaint were performed in furtherance of the purpose of creating unlawful claims profits.  In combination with other related unlawful claims handling practices, these practices enabled Allstate to increase its policyholder surplus from approximately $4 billion in 1994 to approximately $17 billion in 2004, and to pay billions of dollars of dividends to shareholders, including Allstate employees, during that same period.

## IV.  DESCRIPTION OF UNDERLYING ACTION'S LIABILITY AND DAMAGES

72.  On September 5, 2006, Gervais V. Loubier and Claudette J. Loubier filed in the above captioned court, the following:

### AMENDED COMPLAINT AS OF RIGHT (DOCKET ENTRY [DE] 101.00)

COUNT 1:    NEGLIGENCE BY THE DEFENDANT VIS A VIS PLAINTIFF, GERVAIS J. LOUBIER

1. On Monday, February 13, 2006 at approximately 11:22 A.M.,  there was/existed:

a.  An intersection at Willow Street and Pine Street (Intersection), both public highways in the Town of Waterbury, Connecticut;

b.  No traffic control signal/sign/lines on Willow Street at said Intersection;

c.  A stop sign and stop lines on Pine Street at said Intersection, regulating by law the driver of a motor vehicle on Pine Street entrance to said Intersection;

d.  Conn. Gen. Stat. § 14-301,  Through Ways. Stop Signs,  (2006), which states in pertinent part:

(c) The driver of a vehicle shall stop in obedience to a stop sign at such clearly marked stop line or lines as may be established by the traffic authority having jurisdiction or, in

15

the absence of such line or lines, shall stop in obedience
to a stop sign at the entrance to a through highway and
shall yield the right-of-way to vehicles not so obliged to stop
which are within the intersection or approaching so
closely as to constitute an immediate hazard.

2. At said time:

    a. The plaintiff, Gervais J. Loubier, was driving his 1999 Dodge
Dakota pickup truck North on Willow Street through its intersection with
Pine Street.

    b. The defendant, Christian Mateo-Cruz, was driving his 1996
Chevrolet Lumina   East on Pine Street through its intersection with
Willow Street.

    c. While going through said intersection, the front end of the
defendant's, Christian Mateo-Cruz, vehicle struck the left rear wheel of
the plaintiff's, Gervais J. Loubier, vehicle.

    d. In addition to being unexpectedly and violently being thrown
about, the plaintiff's, Gervais J. Loubier, seat belt snapped into his
neck.

3. Said occurrence was due to the negligence and carelessness of the
defendant in one or more of the following ways:

    a. IN THAT he failed to keep a reasonable and proper lookout and
to pay attention to where he was going:

    b. IN THAT he operated said automobile at a greater rate of
speed than the circumstances warranted;

    c. IN THAT he failed to sound his horn or give the plaintiff,
Gervais J. Loubier, a timely warning, or any warning whatsoever, of the
impending collision;

    d. IN THAT he failed to keep and operate said automobile under
proper control;

    e. IN THAT he failed to turn said automobile in time to avoid said
collision;

    f. IN THAT he violated the motor vehicle laws of the State of
Connecticut in operating said motor vehicle at a rate of speed greater
than is reasonable having regard to the width, traffic, and use of the

highway, and the weather conditions;

     g.   IN THAT he violated the motor vehicle laws of the State of Connecticut in failing to grant or yield the right of way at said intersection to the plaintiff's, Gervais J. Loubier vehicle.

4.  As a result of the negligence and carelessness of the defendant, the plaintiff, Gervais J. Loubier, suffered non-economic damages as follows:

    a.  Shock.

    b.  Fright.

    c.  Excruciating pain.

    d.  Cervical and lumbar radiculopathy secondary to cervical and lumbar spine trauma and, although he has had previous lumbar findings, said motor vehicle collision clearly aggravated the situation and made his symptoms bad enough to prompt his having to undergo anterior cervical discectomy, interbody bone graft fusion and anterior cervical plate fixation at the C4-5 level.

    e.  Edema.

    f.  Tenderness.

    g.  Being bedridden.

    h.  Being homebound.

    i.  Disability.

    j.  Suffering through needless hospitalization, medical treatment and physical therapy with its loss of time and energy as well as expense.

    k.  Emotional distress.

    l.  Loss of the enjoyment of life.

5.  As a result of the negligence and carelessness of the defendant, the plaintiff, Gervais J. Loubier, suffered economic damages caused proximately therefrom such as the cost for the healthcare he underwent and is undergoing, which as of the service of this Complaint is over $82,000.00.

17

6. As a result of the negligence and carelessness of the defendants, the plaintiff, Gervais J. Loubier, will probably suffer future economic and non-economic harm and loss caused proximately therefrom such as:

    a. Non-economic:

        1. Pain.

        2. Suffering.

        3. Disability.

        4. Hospitalization, medical treatment and physical therapy.

        5. Emotional distress.

        6. Loss of the enjoyment of life.

    b. Economic:   The cost for future healthcare.


COUNT 2:   NEGLIGENCE PER SE BY THE DEFENDANT VIS A VIS PLAINTIFF, GERVAIS J. LOUBIER

1-3. Paragraphs 1-3 of Count 1 are incorporated here.

4. The foregoing breach of duty by the defendant, to the plaintiff, Gervais J. Loubier, is negligence per se in that it is conduct expressly forbidden by said Conn. Gen. Stat. § 14-301, Through Ways. Stop Signs,  (2006).

5. The defendant violated said statute.

6. At all times relevant hereto, the plaintiff, Gervais J. Loubier, was in the class of persons intended to be protected by said statute.

7.   Said collision, resulting from the violation, was a substantial contributing factor in the cause of the plaintiff's, Gervais J. Loubier, injury and damages.

8-10. Paragraphs 4-6 of Count 1 are incorporated here.


COUNT 3:   RECKLESSNESS BY THE DEFENDANT VIS A VIS PLAINTIFF, GERVAIS J. LOUBIER, IN VIOLATION OF C.G.S.A. § 14-222

1-7.  Paragraphs 1-7 of Count 2 are incorporated here.

8.  The defendant was in a hurry  and  not paying attention so he did not even look to see if another vehicle, such as that of the plaintiff, was coming, before he entered said intersection,  disregarding said  stop sign and stop lines on Pine Street at said intersection,  with his vehicle as aforesaid.

9.  Conn. Gen. Stat. § 14-222,  Reckless Driving,  (2006) states in pertinent part:

> (a) No person shall operate any motor vehicle upon any public highway of the state, . . .  recklessly,  having regard to the width, traffic and use of such highway, . . ., the intersection of streets and the weather conditions.

10.  Conn. Gen. Stat. § 14-295, Double Or Treble Damages For Personal Injury Or Property Damage Resulting From Certain Traffic Violations, (2006) states in pertinent part:

> In any civil action to recover damages resulting from personal injury, wrongful death or damage to property, the trier of fact may award double or treble damages if the injured party has specifically pleaded that another party has deliberately or with reckless disregard operated a motor vehicle in violation of section . . . 14-222,  . . ., and that such violation was a substantial factor in causing such injury, death or damage to property.

11.  Being as the defendant deliberately and with reckless disregard violated C.G.S.A. § 14-222 and that such violation was a substantial contributing factor in the cause of said collision, the defendant is subject to the provisions of C.G.S.A. § 14-295.

12-14.  Paragraphs 4-6 of Count 1 are incorporated here.

## COUNT 4:    WIFE'S LOSS OF CONSORTIUM BY DEFENDANT

1-14.  Paragraphs 1-14 of Count 3 are incorporated here.

15.    The plaintiff, Claudette Loubier, has the right of undisturbed consortium with her husband, the plaintiff,  Gervais J. Loubier, which was breached as aforesaid by the defendant.

16.  As a proximate result thereof, the plaintiff,  Claudette Loubier, has

19

lost the consortium of her said husband by the following loss or reduction of:

    a.  Companionship;

    b.  Sense of security, well being and happiness.

WHEREFORE, the plaintiffs, respectfully, request this Honorable Court to:

    1.  Award them the actual damages suffered by them as proved at trial;

    2.  Award punitive damages as allowed by law;

    3.  Award the plaintiffs the costs of this action and their attorney's fees;

    4.  Grant such other and further relief as this Court deems just, proper, or equitable under the circumstances.

73.  On September 6, 2006, Gervais V. Loubier and Claudette J. Loubier filed in the above captioned court, the following disclosures of expert witnesses, DE 102.00 and DE 103.00, respectively, stating in pertinent part:

    a.  Pursuant to C.P.B.A. § 13-4, the plaintiffs hereby give notice of the disclosure of the following expert witness they expect to call at the time of trial:

    1. NAME

    Patrick P. Mastroianni, M.D.
    Diplomate of the American Board of Neurological Surgery
    340 Capitol Avenue
    Bridgeport, Connecticut  06606

    2. SUBJECT MATTER OF TESTIMONY

Plaintiffs' expert, one of his treating physicians, will testify on the care he rendered to the plaintiff, Gervais J. Loubier, concerning the injuries he suffered, as alleged in plaintiffs' Complaint in this case, as well as, generally, on the subject of medicine and, particularly, Neurological Surgery, Physical Therapy, Pain Management, Disability Evaluation as well as his evaluation of plaintiff, including, inter alia, but not limited to:

    a.  Date he was first seen for the incident alleged.

    b.  His general history and particular history of his injury for the

incident alleged.

   c.  His subjective and objective complaints, including any assessment of pain and its extent suffered by him for the incident alleged.

   d.  Interpretation of his x-rays, CT Scans, MRIs or other tests for the incident alleged.

   e.  Treatment rendered him for the incident alleged.

   f.  Any temporary and/ or permanent disability/ impairment for him for the incident alleged.

   g.  If he reached maximum medical improvement, and the date thereof, for the incident alleged

   h.  His diagnosis and prognosis of Gervais J. Loubier, including any assessment of future treatment and its cost as well as will there be any permanent disability/ impairment for him for the incident alleged.

   i.  His judgment as to any activities for work/ recreation/ normal living which he should not be doing?

### 3.  SUBSTANCE OF FACTS AND OPINIONS AND TESTIMONY

In addition to that stated in Paragraph 2 above, the plaintiffs' expert will testify in accordance with his notes, chart, and reports, which have already been provided the defendant and, particularly, the following subsumed in Patrick P. Mastroianni, M.D.'s, Note of April 7, 2006 for Mr. Loubier:

RE: GERVAIS LOUBIER

Mr. Loubier is in today after having sustained a motor vehicle accident on February 13, 2006.   Mr. Loubier was driving a vehicle that was struck by another vehicle from the rear driver's side.   Initially, he was shaken up and within a few hours experienced pain in the neck and low back.   The neck pain radiates into his left shoulder and sometimes into his left arm.   In addition there is numbness.   The low back pain will radiate into the right leg in an approximate L5 distribution,  there is sometimes numbness in the left upper leg as well.  Mr. Loubier was evaluated by Dr. Brenis, and physical therapy was given.   When symptoms remained,  an MRI was obtained of both the neck and the

low back, and he is seen today for this reason.

## PAST MEDICAL HISTORY:

Positive only for one prior injury, in which a scaffolding that he was working on collapsed, causing injuries to his low back and his neck. His low back injury involved lumbar disc herniation at L3-4, which was subsequently treated surgically.

. . . .

## PHYSICAL EXAMINATION:

The patient is a middle-aged man with pain in the neck and low back. . . .

## NEUROLOGIC EXAMINATION:

He is alert, oriented and appropriate.

Motor testing reveals definite weakness of the deltoid muscle on the left hand side. There is also weakness of the dorsiflexors of the right foot.

## RADIOLOGY:

Cervical MRI shows disc herniation at the C4-5 level on the left hand side with compression of the C5 nerve root. . . .

## ASSESSMENT AND PLAN:

This patient has cervical and lumbar radiculopathy secondary to cervical and lumbar spine trauma. Although this patient has had previous lumbar findings, the motor vehicle accident of February 13, 2006 clearly aggravated the situation and made his symptoms bad enough to prompt repeat scans. In any case, both of this patient's cervical and lumbar spines have significant findings. This taken together with a significant degree of symptomatology, would suggest that surgical correction is in order. I would recommend initially that he undergo anterior cervical discectomy, interbody bone graft fusion and anterior cervical plate fixation at the C4-5 level. The nature of the procedure as well as the risks and possible complications were fully explained to the patient and he wishes to proceed, we will make arrangements accordingly.

22

## 4. SUMMARY OF THE GROUNDS OF THE OPINION

The testimony of the expert as set forth above is based upon:

    a. The history he took of Gervais J. Loubier

    b. The examinations he performed on Gervais J. Loubier.

    c. His review of Gervais J. Loubier's medical records, including medical and test reports/ notes on, or for, Gervais J. Loubier.

    d. His education, training, experience and Board Certification in medicine, and, particularly, Neurological Surgery, Physical Therapy, Pain Management, Disability Evaluation and medical literature.

b. Pursuant to C.P.B.A. § 13-4, the plaintiffs hereby give notice of the disclosure of the following expert witness they expect to call at the time of trial:

### 1. NAME

Robert W. Nolan, M.D.
Orthopedic Surgeon
111-121 Wakelee Avenue
Ansonia, Connecticut 06401

### 2. SUBJECT MATTER OF TESTIMONY

Plaintiffs' expert, one of his treating physicians, will testify on the care he rendered to the plaintiff, Gervais J. Loubier, concerning the injuries he suffered, as alleged in plaintiffs' Complaint in this case, as well as, generally, on the subject of medicine and, particularly, Orthopedic Surgery, Spine Surgery, Physical Therapy, Pain Management, Disability Evaluation as well as his evaluation of plaintiff, including, inter alia, but not limited to:

    a. Date he was first seen for the incident alleged.

    b. His general history and particular history of his injury for the incident alleged.

    c. His subjective and objective complaints, including any assessment of pain and its extent suffered by him for the incident alleged.

    d. Interpretation of his x-rays, CT Scans, MRIs or other tests for

the incident alleged.

    e.  Treatment rendered him for the incident alleged.

    f.   Any temporary and/ or permanent disability/ impairment for him for the incident alleged

    g.  If he reached maximum medical improvement, and the date thereof, for the incident alleged

    h.  His diagnosis and prognosis of Gervais J. Loubier, including any assessment of future treatment and its cost as well as will there be any permanent disability/ impairment for him for the incident alleged.

    i.  His judgment as to any activities for work/ recreation/ normal living which he should not be doing?

### 3.  SUBSTANCE OF FACTS AND OPINIONS AND TESTIMONY

In addition to that stated in Paragraph 2 above, the plaintiffs' expert will testify in accordance with his notes, chart, and reports, which have already been provided the defendant and, particularly, the following subsumed in Robert W. Nolan, M.D.'s, Note of May 1, 2006 for Mr. Loubier:

SUBJECTIVE:   Gervais Loubier is here for a preop discussion.   He is scheduled for anterior cervical discectomy/ fusion at C4-5 relating to an accident February 13'" when he was struck.   His seat belt snapped into his neck.   He had quite a bit of pain.   He subsequently was under the care of Dr. Mastroianni who evaluated him and felt he was in need of decompression at C4-5.   He is scheduled for surgery.   He is here for discussion regarding that.   He is right hand dominant.   Medical history was reviewed.   He does smoke a pack of cigarettes a day.

OBJECTIVE:   Exam shows he has left sided cervical pain with rotation to that side.   There is pain radiating down the left shoulder.   He has difficulty lifting and reaching with that left arm as well.   Cervical MR was reviewed and confirms significant pathology at C4-5 with neuroforaminal encroachment.

ASSESSMENT: C4-5 disc herniation, left sided neck and arm pain

PLAN:   He is scheduled for a decompression stabilization

procedure.   I explained to him the nature of the procedure, risks, complications, postop rehab issues. Possibilities of nonunion, failure of the operation, persistence of pain, loss of motion, future surgery and anesthetic related risks were explained to him. He signed a permit. I believe he gave informed consent.   He'll return to the office 2 weeks postop for x-ray.

### 4.  SUMMARY OF THE GROUNDS OF THE OPINION.

The testimony of the expert as set forth above is based upon:

a. The history he took of Gervais J. Loubier.

b. The examinations he performed on Gervais J. Loubier.

c. His review of Gervais J. Loubier's medical records, including medical and test reports/ notes on, or for, Gervais J. Loubier.

d. His education, training, experience and Board Certification in medicine, and, particularly, General Orthopedic Surgery, Spine Surgery, Physical Therapy, Pain Management, Disability Evaluation and medical literature.

74. Per Judge Agati's, the Presiding Judge of the above captioned court, guidance at Short Calendar in reference case, the defendant's counsel, Greg S. Kreiger, Esquire of Howard, Kohn, Sprague & Fitzgerald, LLP from Hartford, Connecticut, retained their own medical experts to review the images (e.g. X-rays and Ct-scans) and all medical/ hospital/ physical therapy/ pharmaceutical records arising from said collision caused by Mr. Mateo-Cruz, as well as those relevant like items prior thereto, and promptly admitted liability for said collision, paying, respectively, for:

a. The loss to his said vehicle;   and

b. The amount of $50,000.00 from Mr. Mateo-Cruz's insurer, State Farm Insurance Company, for payment of its policy limits to Gervais V. Loubier in said case.

## IV. PRESENT ACTION

75. On or about February 3, 2001, all premiums due on Claudette J. Loubier's and Gervais V. Loubier's said policy with Allstate had been paid and said policy was in full force and effect.

76. Even with the payment of Mr. Mateo-Cruz's insurer, State Farm Insurance Company, to Gervais V. Loubier, he has not been made whole in law or fact.

77. Under the terms of Claudette J. Loubier's and Gervais V. Loubier's said policy Allstate promised to promptly pay damages which Claudette J. Loubier and Gervais V. Loubier are legally entitled to recover from the owner/ operator of an under insured motor vehicle because of bodily injury arising from said collision caused by Mr. Mateo-Cruz.

78. On May 4, 2006, Claudette J. Loubier and Gervais V. Loubier below signed counsel hand delivered a self-explanatory 24 page letter to Allstate via Sean Clifford, their said Allstate Agent, at his office at 1015 Meriden Road, Waterbury, Connecticut 06705, stating in pertinent part, but with the exhibits-attachments omitted:

RE:  My clients and claimants:     Gervais J. Loubier and
                                             Claudette Loubier
     Date of Injury:                   2-13-06
     Tortfeasor & State Farm's Insured:   Christian Mateo-Cruz
     State Farm's File #:            07 307 2250
     Your clients and Allstate's Insureds: Gervais J. Loubier and
                                              Claudette Loubier
     My client's Allstate Policy Number:   0 25 455436 03/05

Dear Mr. Clifford:

In follow up to our phone conversation in reference, please be reminded that I represent Gervais J. Loubier and his wife, Claudette Loubier, in

26

reference.  You, Allstate, and any of its employees, agents, representatives or attorneys, should deal with me in any matter concerning  reference.

Pertaining to reference:

1.  My self-explanatory, 16 page facsimile of April 14, 2006 to the State Farm's claims representatives for referenced tortfeasor is attached as Exhibit A hereto;  and

2.  State Farm's claims representative's self-explanatory two page letter of April 25, 2006 to me  in response to said Exhibit A is attached as Exhibit B hereto.

In addition to the treatment he has received to date as a direct result of referenced injuries caused by the tortfeasor,  Mr. Loubier will undergo cervical disk surgery this Friday, May 5, 2006, by the team of Robert W. Nolan, M.D., an orthopedic surgeon,  and Patrick P.  Mastroianni, M.D., a neurological surgeon;  a description of the surgery  taken from the booklet provided him by Dr. Nolan  (color cover and color pages 12 and 13) is attached as Exhibit C hereto.    Further, assuming all goes well and upon    recovery from said cervical disk surgery,  which is expected to be in 1-3 months,  — again as a direct result of referenced injuries caused by the tortfeasor — said team will perform  a surgery on Mr. Loubier's lower back.    Also,  as a direct result of referenced injuries caused by the tortfeasor,   Mr. Loubier will require further appropriate treatment.

As you can readily see,  even at this early stage it is expected that Mr. Loubier costs of treatment will be some $50,000.00 and probably much more.  When you take into account the other economic and great non-economic loss Mr. Loubier and his wife have and will suffer from referenced incident,  the tortfeasor's insurance policy limits are manifestly inadequate — indeed,  I  expect  State Farm will tender them to my clients — and,  therefore, my clients hereby make a claim under the Underinsured Motorists provisions of their referenced policy with Allstate.

Please have the appropriate Allstate claims representative contact me to amicably settle this matter

Sincerely,

EDDI Z. ZYKO, ESQUIRE

27

79. On August 8, 2006, Claudette J. Loubier and Gervais V. Loubier below signed

counsel received from Allstate an E-mail, stating in pertinent part, but with the

attachments omitted:

> 3965353579lyc
> Tuesday, August 8, 2006 4:11 PM
>
> From: "Coyle, Yvonne" <Yvonne.Coyle@Allstate.com>
> To: eddi_z_zyko@snet.net
> Message contains attachments
> Notebook.jpg (3KB)
>
> re Gervais loubier......pls forward an up to date package of meds. I would
> also like to know if he is still treating? with whom? how many times per
> week?
>
> i would also like a complete medical package relating to his neck
> surgery 5 years ago with his w/c carrier.
>
> our mailing address is:
> Allstate insurance co
> 74 batterson park rd
> Farmington CT 06032
>
> Yvonne D. Coyle
> Sr. Claims Processing Specialist
> Farmington MCO
> (860) 676-4162
> (860) 284-2566 fax
> e-mail: cdxbd@allstate.com

80. On August 21, 2006, Claudette J. Loubier and Gervais V. Loubier below signed

counsel sent a self-explanatory multi page letter to Allstate, stating in pertinent part,

but with the exhibits-attachments omitted:

> Ms. Yvonne D. Coyle
> Senior Claims Processing Specialist
> Farmington MCO
> Allstate insurance Company  (Allstate)
> 74 Batterson Park Road
> Farmington, Connecticut  06032